1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

PATRICK T. FORSYTHE,              )  No. ED CV 04-373-PJW
11                                )
                 Plaintiff,       )
12                                )  MEMORANDUM OPINION AND ORDER
           v.                     )
13                                )
JO ANNE B. BARNHART, Commissioner )
14  of the Social Security        )
    Administration,               )
15                                )
                 Defendant.       )
16  _____)

17                              I.

18                         INTRODUCTION

19       Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and

20  1383(c)(3), seeking reversal of the decision by Defendant Social

21  Security Administration ("Agency") denying Supplemental Security

22  Income ("SSI") and Disability Insurance Benefits ("DIB").

23  Alternatively, he asks the Court to remand the case to the Agency for

24  further proceedings.  For the reasons discussed below, the Agency's

25  decision is reversed and the case is remanded for additional

26  proceedings.

27

28

II.

BACKGROUND

Plaintiff was born on September 3, 1960, and was 43 years old at the time of the relevant administrative hearing.  (AR 263, 278.)  He has a twelfth-grade education and past relevant work as a welder, warehouse worker, gas station attendant, audiovisual technician assistant, stocker, and food service worker.  (AR 12, 278.)

Plaintiff filed protectively for DIB on February 1, 2000.  (AR 61-63.)  In his application, Plaintiff alleged disability since November 1, 1997 because of mental illness.  (AR 11, 278.)  Plaintiff timely requested a hearing before an administrative law judge ("ALJ") after his claim was denied initially and on reconsideration.  (AR 49, 54.)

Over the years, the ALJ held two hearings on Plaintiff's application.  Although only the decision that followed the second hearing is at issue in this case, the substance of both hearings and the evidence introduced at each is relevant because of the nature of Plaintiff's allegations.  Accordingly, the Court will summarize the hearings in chronological order.

A.   The First Hearing (April 9, 2001)

The first hearing was held on April 9, 2001.  (AR 17.)  Plaintiff appeared with counsel and testified.  (*See* AR 19-31, 42-43.)  The ALJ also heard testimony from Diane Corona and James Fry, two of Plaintiff's personal acquaintances.  (*See* AR 31-38.)  Finally, vocational expert Corinne Porter testified.  (AR 39-42.)

At that first hearing, Plaintiff testified that he experienced anxiety, depression, mood swings, paranoia, difficulty concentrating and controlling his impulses, and discomfort around other people.  (AR

20-22.)  He also stated that, sometimes, he heard "someone calling my name and I look around and there's nobody there."  (AR 22.)  Plaintiff had been receiving monthly, half-hour counseling sessions from a psychiatrist for a year and a half, and had been prescribed Zyprexa, Depekote, Serizone, and Benadryl.  (AR 22-23, 30.)  He explained that his counseling and medications helped him, but added that his medicine did not eliminate his anxiety completely, and testified that these medications caused some side-effects, including confusion and some sexual dysfunction.  (AR 30-31.)  Plaintiff stated that he had been fired from his two previous jobs--sweeping the floors for a magazine publisher and distributing televisions to classrooms for a school.  (AR 24-26.)  He could not remember any of his other jobs, and could only recall looking for one other specific job.  (AR 27.)  After being fired from his job at the magazine publisher, Plaintiff received unemployment for approximately one year; since losing his second job, Plaintiff's source of income has been General Relief.  (AR 25, 29.)  According to Plaintiff, he dropped out of community college after two semesters because he "wasn't doing too good," and his driver's license had been suspended because of "child support."  (*See* AR 25-26, 28.)  Plaintiff's typical day involved watching television and talking to friends and family, and dining out with his friend Jim (*i.e.*, James Fry), who helped "take care of" him.  (AR 23, 28-29.)  Plaintiff explained that Fry helped him by shopping, driving him wherever he needed to go, selecting appropriate clothes for him to wear, and reminding him to bathe.  (AR 23-24, 29.)

The ALJ next heard testimony from Diane Corona and James Fry, Plaintiff's friends.  (AR 31-38.)  Diane Corona testified that she had known Plaintiff for 18 months, and related anecdotes about Plaintiff's

3

propensity for striking up inappropriate, sexually-explicit
conversations in public places.  (*See* AR 32-35.)  As one of
Plaintiff's classmates in college, Ms. Corona described his
inappropriate behavior in class and stated that he appeared to be
unable to complete assignments.  (*See* AR 34.)  James Fry testified
that he had been Plaintiff's roommate for three of the five years they
had known each another.  (AR 36.)  Mr. Fry attested to Plaintiff's
mood swings, poor impulse control, and inability to complete household
chores; Fry related that, on three occasions, Plaintiff had attacked
him physically.  (AR 36-38.)

Finally, the vocational expert, Ms. Corinne Porter, testified.
(AR 39-42.)  Ms. Porter classified Plaintiff's prior employment as a
warehouseman, an unskilled position that he performed at the light
exertional level.  (AR 39.)  The ALJ then posed the following
hypothetical question:

> [C]onsider a person of [Plaintiff's] vocational background.
> His age, education and work experience.  And consider that
> there are no exertional limits and work is possible at any
> exertional level.  Consider, however, that there are these
> following mental limits: The work should be routine and
> repetitive.  Should be entry level.  Minimally stressful.
> Should not require contact with the general public.  And
> should require only a superficial degree of interpersonal
> contact.

(AR 39-40.)  In response to this hypothetical question, the vocational
expert testified that Plaintiff could return to his former work.  (AR
40.)  Additionally, Ms. Porter testified that this hypothetical person
could perform other unskilled jobs existing in significant numbers in

1  the local economy, including that of linen room attendant, janitor,
2  and production packer.  (AR 40.)  On re-examination, however,
3  Plaintiff told the ALJ that he did not feel he could perform these
4  other jobs because of his depression and anxiety.  (AR 42-43.)

5      Plaintiff's attorney posed a hypothetical question of his own to
6  Ms. Porter.  In addition to the limitations set forth in the ALJ's
7  question, counsel added:

8          Ability to remember vocations [*sic*] and work-like procedures
9          is markedly impaired.  Ability to understand and remember
10         very short and simple instructions is markedly impaired.
11         Ability to carry out very short and simple instructions is
12         markedly impaired.  Ability to maintain attention and
13         concentration for extended periods is extreme [*sic*].
14         Ability to perform activities within a schedule and maintain
15         regular attendance and be punctual within customary
16         tolerances is moderate [*sic*].  Ability to sustain ordinary
17         routine within special provision is markedly impaired.
18         Ability to work in coordination or within approximity [*sic*]
19         to others without being distracted by them is extreme [*sic*].
20         Ability to make simple work related decisions is markedly
21         impaired.  Ability to interact appropriately with the
22         general public is extreme [*sic*].  Ability to ask simple
23         questions or request assistance, markedly impaired.  Ability
24         to accept instructions and respond appropriately to
25         criticism from supervisors is extreme [*sic*].  Ability to get
26         along with co-workers or peers without distracting them or
27         exhibiting behavioral extremes is markedly impaired.
28         Ability to maintain socially appropriate behavior and to

1        adhere to basic standards in neatness and cleanliness is

2        moderately impaired.  And then we have extreme impairments

3        in the ability to respond appropriately to changes in the

4        work setting.  Ability to be aware of normal hazards and

5        take appropriate precautions.  And ability to set realistic

6        goals or make plans independently of others.

7 (AR 41.)  Ms. Porter testified that no positions would be available

8 for that hypothetical person.  (AR 41-42.)  Counsel offered no

9 argument, and the ALJ adjourned the hearing.  (AR 43-44.)

10     On April 19, 2001, after analyzing Plaintiff's claims under the

11 Agency's five-step sequential evaluation process, the ALJ issued a

12 decision, concluding that Plaintiff was not disabled.  (AR 10-15.)

13 After finding that Plaintiff had "not engaged in substantial gainful

14 activity since his alleged onset date," (AR 12), the ALJ proceeded to

15 step two.  There, the ALJ found that Plaintiff had "a very

16 questionable severe mental impairment[,] affective in nature."  (AR

17 12.)  At step three, however, the ALJ found that Plaintiff's mental

18 impairment did "not meet or equal Listing severity." (*See* AR 16.)

19 Accordingly, the ALJ proceeded to step four and assessed Plaintiff's

20 residual functional capacity.  In light of the medical evidence, the

21 ALJ stated:

22        I find that the [Listing] B criteria credibly established by

23        [Plaintiff] as [indicating] no more than slight restrictions

24        of daily living because of refusal to detail activities of

25        daily living, slight to possibly moderate difficulties in

26        maintaining social functioning considering the testimony of

27        daily visits with friends and family and going out to eat,

28        no deficiencies of concentration, persistence or pace, and

1    no episodes of deterioration or decompensation in work or
2    work-like settings.
3  (AR 14.)   In light of those limitations, the ALJ accepted the
4  vocational expert's opinion that Plaintiff could perform his past
5  relevant work and found, in the alternative, that Plaintiff retained
6  sufficient residual functional capacity to perform a range of
7  unskilled work.  (*See* AR 14-15.)  Accordingly, the ALJ concluded that
8  Plaintiff was not disabled as defined in the Social Security Act (the
9  "Act") at any time through the date of the decision.  (AR 15.)

10   Plaintiff timely requested review of the ALJ's decision.  (AR 5.)
11 The Appeals Council denied review, however, and the decision became
12 final.  (AR 3-4.)  Plaintiff then filed suit in this Court.  By
13 stipulation of the parties, the Court remanded the matter to the
14 Agency for further proceedings.  (AR 291-92.)  Pursuant to this
15 Court's Order, the Appeals Council vacated the ALJ's decision and
16 remanded the matter to the ALJ, with detailed instructions.[1]  (*See* AR
17 296-98.)

18 B.   The Second Hearing (October 7, 2003)

19   On remand, the same ALJ held a second hearing on Plaintiff's
20 application for DIB on October 7, 2003.  (AR 431-43.)  Once more,
21 Plaintiff appeared with counsel and testified.  (*See* AR 433-39.)  The
22 ALJ also heard testimony from vocational expert Joseph Mooney.  (AR
23 439-43.)

24   Plaintiff reiterated his previous testimony regarding his
25 depression, anxiety, and asthma, and added that he "was born with

26 _____

27      [1]  The remand instructions of the Appeals Council, which are the
   subject of both of the substantive issues that Plaintiff raises, (*see*
28 Motion at 2-4), will be set forth at length below.

7

1   ADHD" and, consequently, misplaces items and forgets what he reads.

2   (*See* AR 434-36.)  He confirmed that he continued to receive counseling

3   on a near-monthly basis.  (AR 436.)  Although the record suggested

4   that Plaintiff's doctors had discontinued many of his medications, he

5   claimed that his doctors recently had told him to resume taking all of

6   the prescribed medications that he had reported taking at the 2001

7   hearing, plus medication for acid-reflux and another to lower his

8   cholesterol.  (AR 436-39.)  Additionally, Plaintiff claimed that he

9   was taking Tylenol 500 for a torn ligament in his knee.  (AR 437-38.)

10      Vocational expert Joseph Mooney testified next.  (AR 439.)  He

11  noted that Plaintiff's job at the magazine from 1990 to 1999--which

12  entailed paper shredding and baler operations--was unskilled labor

13  performed at a medium level of exertion.  (AR 439.)  Also, Mr. Mooney

14  noted that Plaintiff's work from 1988 to 1990 as a welder was semi-

15  skilled, and performed at a heavy level of exertion.  (AR 440.)  The

16  ALJ then asked what exertional-level of work a person of Plaintiff's

17  vocational background, age, education and work experience could

18  perform if he "could lift 25 pounds frequently, 50 pounds

19  occasionally, stand and walk for six hours in an eight hour work day

20  and sit for six hours in an eight our work day" but was excluded from

21  jobs requiring repetitive bending, stooping, squatting, crouching,

22  crawling, kneeling, prolonged walking, or exposure to heavy

23  concentrations of respiratory contamination or pollution.  (*See* AR

24  440.)  Mr. Mooney replied that that hypothetical person could still

25  perform a full range of work at the medium level of exertion.  (AR

26  440.)  The ALJ then completed the hypothetical question:

27      In addition to the assessment for medium exertional work,

28      assume that there are mental limits, namely that the work

8

1  should be routine and repetitive, entry level, minimally
2  stressful, should require no contact with the general public
3  and should require only a superficial degree of
4  interpersonal contact.  Within that entire assessment now,
5  could [Plaintiff] return to past relevant work, any of it?

6  (AR 440-41.)  The vocational expert replied that Plaintiff could

7  perform his former work as a magazine warehouseman, but could not

8  return to his work as a welder.  (AR 441.)  Additionally, Mr. Mooney

9  echoed the previous expert in opining that Plaintiff could perform

10 other unskilled labor, including janitorial and hand assembly work.

11 (*See* AR 441.)  The expert conceded, however, that if this hypothetical

12 person had a severe impairment in his ability to interact with

13 supervisors, co-workers, or the public, he would be precluded from any

14 type of work.  (AR 442.)

15    Plaintiff's counsel then posed a stand-alone hypothetical

16 question to Mr. Mooney along the lines of the one he had posed to the

17 vocational expert who testified at the first hearing.  Counsel's

18 hypothetical question was:

19  [Assume a person] [m]oderately to severely impaired in his
20  ability to maintain concentration and attention required to
21  perform work related tasks, moderately impaired in ability
22  to associate with day to day work activity including,
23  including [*sic*] attendance and safety, moderately impaired
24  in ability to adapt to the stresses common to a normal work
25  environment, moderately impaired in his ability to maintain
26  regular attendance in the workplace and perform work
27  activities on a consistent basis, and lastly, moderately to
28

9

1          severely impaired in his ability to perform work activities
2          without special or additional supervision.

3    (AR 442.)  The vocational expert testified that these limitations
4    would "preclude competitive employment."  (AR 442-43.)  Once more,
5    counsel offered no further questions or argument, and the ALJ
6    adjourned the second hearing.  (AR 443.)

7          On December 3, 2003, after analyzing Plaintiff's claims under the
8    Agency's five-step sequential evaluation process, the ALJ issued a
9    second decision, again denying his claim for benefits.  (AR 277-283.)
10   After summarizing the instructions contained in the Appeals Council's
11   remand order, (*see* AR 277), the ALJ stated that "[t]he prior decision
12   is incorporated by reference herein and remains the decision on remand
13   as supplemented herein below."  (AR 279.)  Accordingly, at step one,
14   the ALJ again accepted Plaintiff's contention that he had "not engaged
15   in substantial gainful activity since his alleged onset date."  (AR
16   282.)  At step two, the ALJ found that Plaintiff has degenerative
17   joint disease of the knees, asthma, and bipolar disorder with a
18   history of ADHD, a combination of impairments that was "severe" within
19   the meaning of the regulations.  (*See* AR 280.)  At step three,
20   however, the ALJ found that Plaintiff's limitations were "not severe
21   enough to meet or medically equal" a Listing.  (*See* AR 280.)  The ALJ
22   then reassessed Plaintiff's residual functional capacity:

23          [Plaintiff can] lift and carry fifty pounds occasionally,
24          and twenty five pounds frequently; stand and walk six hours
25          per eight-hour workday with customary breaks and no
26          prolonged walking; sit eight hours per eight-hour workday
27          with customary breaks; no frequent or repetitive climbing,
28          stooping, kneeling, crouching, or crawling; and no exposure

                                        10

1   to heavy concentrations of respiratory contamination or
2   pollution.  Mentally, he can perform on a full time,
3   sustained basis routine and repetitive entry-level,
4   minimally stressful work involving no contact with the
5   general public and only superficial interpersonal contact
6   otherwise.

7 (*See* AR 281-82.)  Measured against this assessment of Plaintiff's
8 residual functional capacity, and accepting Mr. Mooney's opinion that
9 he could return to his work as a warehouse worker, the ALJ made the
10 step-four determination that Plaintiff could perform his past relevant
11 work.  (*See* AR 282.)  Alternatively, the ALJ concluded that Plaintiff
12 retained sufficient residual functional capacity to perform a range of
13 unskilled medium-exertion work, including jobs as a janitor, cleaner,
14 assembler, and packager.  (AR 282.)  On these bases, the ALJ once more
15 concluded that Plaintiff was not disabled at any time through the date
16 of the decision.  (AR 283.)

17     Plaintiff did not request Appeals Council review of the second
18 decision. Accordingly, by operation of the regulations, the second
19 decision of the ALJ became the final decision of the Agency.  *See* 20
20 C.F.R. § 404.984(a).  On March 30, 2004, Plaintiff filed another
21 complaint in this Court.

22                              III.

23                       STANDARD OF REVIEW

24     "Disability" under the applicable statute is defined as the
25 inability to perform any substantial gainful activity because of "any
26 medically determinable physical or mental impairment which can be
27 expected to result in death or which has lasted or can be expected to
28 last for a continuous period of not less than twelve months."  42

1  U.S.C. § 1382c(a)(3)(A).  The Court may overturn an ALJ's decision
2  that a claimant is not disabled only if the decision is not supported
3  by substantial evidence or is based on legal error.  *See Magallanes v.*
4  *Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

5      Substantial evidence "'means such relevant evidence as a
6  reasonable mind might accept as adequate to support a conclusion.'"
7  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison*
8  *Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  It is "more than a mere
9  scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d
10 599, 601 (9th Cir. 1998), and "does not mean a large or considerable
11 amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

12     "The Court must uphold the ALJ's conclusion even if the evidence
13 in the record is susceptible to more than one rational
14 interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595,
15 599 (9th Cir. 1999).  Indeed, if the record evidence can reasonably
16 support either affirming or reversing the Agency's decision, this
17 Court must not substitute its judgment for that of the ALJ.  *See*
18 *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the ALJ
19 committed error but the error was harmless, reversal is not required.
20 *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th
21 Cir. 2003)(applying the harmless error standard).

22                                    IV.

23                                DISCUSSION

24     Plaintiff claims that the ALJ failed to comply with those
25 portions of the Appeals Council's order requiring him to (1) ask each
26 of Plaintiff's treating sources to provide a medical source statement
27 (*see* Motion at 3-4); and (2) discuss the opinions of his treating
28 physicians.  (*See* Motion at 2-3.)

                                    12

1    Both of Plaintiff's arguments will be addressed in the order
2    stated above (which differs from the order in which Plaintiff has
3    briefed them).  As explained below, the ALJ did not obtain medical
4    source statements from Plaintiff's treating physicians.  Because the
5    ALJ did not comply with the Appeals Council's specific instructions on
6    remand, the Court must reverse and remand for further proceedings.

7    A.   The ALJ Did Not Comply With The Appeals Council's Instructions To
8         Obtain Medical Source Statements From Plaintiff's Treating
9         Physicians On Remand

10   Plaintiff argues that the ALJ disregarded the Appeals Council's
11   specific instruction to obtain medical source statements from his
12   treating physicians on remand.  (Motion at 3-4.)  A review of the
13   record demonstrates that the ALJ did not comply with this particular
14   mandate from the Appeals Council.

15   The controlling federal regulations require ALJs to follow the
16   instructions they receive from the Appeals Council on remand.  See 20
17   C.F.R. § 404.977(b)("The [ALJ] *shall* take any action that is ordered
18   by the Appeals Council and may take any additional action that is not
19   inconsistent with the Appeals Council's remand order.")(emphasis
20   added).  At least one district court in our circuit has held that,
21   when an ALJ disobeys the Appeals Council's instructions to obtain
22   specific evidence on remand, his decision is subject to reversal.  *See*
23   *Stewart v. Sullivan*, 810 F.Supp. 1102, 1106 (D. Haw. 1993).  Other
24   courts outside our circuit agree.[2]

25   _____

26   [2]   *See, e.g., Jones v. Barnhart*, 372 F.Supp. 2d. 989 (S.D. Tex.
      2005)(remanding where "the ALJ failed to comply with the Appeals
27   Council's order," which had instructed him to take additional,
      specific evidence about the claimant's residual functional capacity);
28   *Hayes v. Barnhart*, No. C04-3023 (MWB), 2005 WL 263923, at *32 (N.D.

13

1    In Plaintiff's case, the district court remanded the matter to
2    the ALJ for further proceedings.  The stipulated remand Order read, in
3    pertinent part:

4         Upon remand, the ALJ will be instructed to update the
5         medical evidence and obtain an examination by a consultative
6         psychologist or psychiatrist, if necessary.  Also, the ALJ
7         will further evaluate [Plaintiff's] mental residual
8         functional capacity.  In doing so, he will consider the
9         findings and conclusions of all treating, examining, and
10        non-examining sources [. . .], and provide an appropriate
11        rationale as to the weight given to the medical reports of
12        record.  In addition, the ALJ will reconsider the
13        credibility of [Plaintiff's] testimony in light of the
14        updated record, consider the credibility of the testimony of
15        each lay witness, obtain updated evidence from a vocational
16        expert, and take such action as may be necessary to complete
17        the administrative record.

18   (*See* AR 291-92.)  Pursuant to this Court's Order, the Appeals Council
19   vacated the ALJ's decision and remanded the matter to the ALJ with
20   instructions on how to proceed in the second hearing.  (*See* AR 296-
21   98.)  The Appeals Council's instructions were, however, much more
22   specific than those set forth in the Court's stipulated remand order.
23   In particular, the Appeals Council told the ALJ to re-evaluate

24   _____

25   Iowa Jan. 19, 2005)(remanding where "the ALJ failed to comply with the
26   instructions of the Appeals Council on remand"); *Almonte v. Apfel*, No.
     96 CIV 1119 (JGK), 1998 WL 150996, at *7 (S.D.N.Y. March 31,
27   1998)(reversing and remanding for further proceedings when the ALJ
     failed to comply "with the detailed instructions that the ALJ was
28   directed to follow by the Appeals Council.")

1    Plaintiff's subjective complaints and reassess the testimony of the

2    lay witnesses who had testified at the first hearing (*i.e.*, Ms. Corona

3    and Mr. Fry), offering reasons "germane to each witness" if he still

4    rejected that testimony.  (*See* AR 296-97.)  Next, the Appeals Council

5    stated:

6           Upon remand, the [ALJ] *will update the record* with reports

7           from [Plaintiff's] attending physicians and other health

8           care providers, including clinical progress and treatment

9           notes and the records of any periods of hospitalization

10          which may have occurred.  Each treating source *will be asked*

11          to provide a medical source statement about what [Plaintiff]

12          can still do despite the impairments.

13   (AR 296 (emphasis added).)  The remainder of the Appeals Council's

14   instructions were consistent with those set forth in this Court's

15   stipulated remand Order.  (*See* AR 296-98.)

16          The Agency argues that the Appeals Council's remand instructions-

17   -including the instruction to obtain medical source statements--were

18   permissive, not mandatory.  (*See* Cross-Motion at 10.)  The argument is

19   based on a lopsided reading of the record.  Without acknowledging the

20   mandatory language on the first page of the Appeals Council's Order,

21   the Agency cites the second page of that Order, which states, in

22   pertinent part:

23          As appropriate, the [ALJ] may request the treating sources

24          to provide additional evidence and/or further clarification

25          of the opinions and medical source statements about what

26          [Plaintiff] can still do despite the impairments.  The [ALJ]

27          may enlist the aid and cooperation of [Plaintiff's]

28          representative in developing evidence from [Plaintiff's]

15

1    treating sources.  [¶]  If necessary, the ALJ will obtain
2    additional evidence regarding [Plaintiff's] mental
3    impairment consisting of a mental status examination and
4    medical source statement[s] about what [Plaintiff] can still
5    do despite the impairments.

6  (*See* AR 297 (citation omitted); *see also* Cross-Motion at 10.)  The
7  language on the previous page of the Order unambiguously *required* the
8  ALJ to obtain medical source statements from Plaintiff's treating
9  physicians.  (*See* AR 296.)  That being so, the Court interprets the
10 language before the paragraph-break in the above-quoted passage to
11 *permit* the ALJ to seek "clarification" of the required treating
12 medical source statements as he saw fit.  Similarly, the Court
13 interprets the language after the paragraph break in the above-quoted
14 passage to *permit* the ALJ to obtain other medical source statements--
15 beyond those he was already required to procure from Plaintiff's
16 treating physicians--as necessary.  Under this interpretation of the
17 Appeals Council's remand Order, the Court rejects the Agency's
18 contention that this language rendered discretionary the ALJ's overall
19 obligation to obtain medical source statements from Plaintiff's
20 treating physicians.[3]

21

22

23

---

24      [3]  It is worth noting that district courts have reversed ALJs for
25 disregarding even discretionary remand instructions from the Appeals
   Council.  *See*, *e.g.*, *Gister v. Massanari*, 189 F.Supp.2d 930, 935-36
26 (E.D. Wi. 2001)(finding that the ALJ's post-remand psychological
   assessment was not supported by substantial evidence where he
27 discounted the claimant's treating psychiatrist's opinion, stating:
   "[T]he ALJ should have followed the Appeals Council mandate that he
28 seek clarification, if necessary").

Despite the fact that the Appeals Council's remand Order obliged the ALJ to obtain medical source statements[4] from Plaintiff's treating physicians, the record contains no evidence that the ALJ ever attempted to do so. (*Compare* AR 296 *with* AR 299.) Indeed, the only documentation in the record shows that, after the remand, the ALJ asked Plaintiff's counsel to submit "[a]ll medical records (not duplicates) from one year prior to the alleged onset date to the present and any other relevant medical, school, or other records not already in file." (AR 299.) Although the ALJ referred to "the current treating source reports" at one point in the decision, (*see* AR 281), this reference was unaccompanied by any citation to the record, and the Court's search of the record yields no medical source statements postdating the Appeals Council's December 26, 2003 remand Order.[5]

Although the absence of a medical source statement from a treating physician does not necessarily make the record incomplete, *see* 20 C.F.R. § 416.913(b)(6), here the Appeals Council specifically *told* the ALJ, in mandatory terms, to obtain medical source statements from Plaintiff's treating physicians. (AR 296.) Except in situations

---

[4] The pertinent Agency ruling defines medical source statements as "medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *See* Social Security Ruling ("S.S.R.") 96-5p (1996).

[5] The only document post-dating the first hearing that even resembles a request for a medical source statement is a form letter from the State of California to Plaintiff's psychiatrist dated May 17, 2002. (*See* AR 303). By the time the Appeals Council remanded the matter to the ALJ, this request was more than eighteen months old.

not applicable here,[6] ALJs must comply with the Appeals Council's remand orders. *See Geracitano v. Callahan*, 979 F.Supp. 952, 957 (W.D.N.Y. 1997)(reversing where the ALJ failed to obtain a medical source statement, as the Appeals Council had instructed it to do on remand).

In these circumstances, reversal is necessary. It makes no difference that the *other* evidence in the record might be sufficient to support the ALJ's finding of non-disability, as the Agency argues. (*See* Cross-Motion at 10-12.) When confronted with the ALJ's failure to obtain additional evidence as ordered by the Appeals Council, *Stewart* rejected a similar argument, explaining:

> The problem with the ALJ's first two hearings was that they
> failed to develop the record fully--the second time, in
> direct contradiction to the Appeals Council's instructions.
> *The ALJ's determinations may have been supported by the*
> *record, but the record was incomplete because the ALJ failed*
> *to follow the Appeals Council's instructions*.

*Stewart*, 810 F.Supp. at 1106 (emphasis added)(citations omitted). The Court finds persuasive *Stewart's* common-sense approach to this issue, and accepts Plaintiff's argument that the ALJ's second decision cannot be affirmed on the basis that it was consistent with the *other* evidence in the record since the record is incomplete. (*See* Motion at 4.) Thus, the decision must be reversed.

---

   [6]   *See Jackson v. Apfel*, No. CV-97-6214-ST, 2000 WL 1286345 (D. Or. July 6, 2000), at *7 (accepting that the ALJ was required to follow the Appeals Council's instructions to seek a medical source statement from the claimant's treating physician, but forgiving the ALJ's failure to do so in that particular case because the treating physician had not cooperated with the ALJ's two previous attempts to obtain this information).

1   B.   <u>The ALJ Did Not Comply With The Appeals Council's Instructions To</u>
2        <u>Evaluate The Opinions And Residual Functional Capacity</u>
3        <u>Assessments Of Plaintiff's Treating Physicians And To Explain The</u>
4        <u>Weight Given To Each Opinion</u>

5        In addition to the other actions the Appeals Council instructed
6   the ALJ to perform on remand, the Appeals Council also instructed him
7   to reconsider Plaintiff's residual functional capacity, to wit:

8        The [ALJ] will consider the diagnoses endorsed by [treating
9        physician] Dr. Beler and the functional capacity assessment
10       provided by treating source Guia Montenegro, M.D., and
11       determine whether those reports are consistent with each
12       other and with the underlying clinical progress notes.

13   (AR 297.)  Plaintiff complains that the ALJ did not perform these
14   tasks.  (*See* Motion at 2-3.)  Upon reviewing the record, the Court
15   agrees.

16       In the second decision, the ALJ's assessment of the evidence
17   provided by Plaintiff's treating physicians is sparse:

18       The evidence obtained since the prior hearing decision shows
19       that [Plaintiff] has continued in treatment for bipolar
20       disorder and arthritis as well as other minor problems
21       involving gastroesophageal reflux disease, an isolated
22       urinary tract infection, and asthma.  Indeed, [Plaintiff's]
23       treatment has been quite conservative and routine with no
24       indication of any change in [his] medication, psychotropic
25       or otherwise.  [¶]  Indeed, there is no documentation of any
26       treatment of his physical impairments since June 2002, and
27       the treating mental health notes indicated that [Plaintiff]
28       had been attending classes to be a drug and alcohol

19

1      counselor and was near completion of that program in
2      November 2002 and that he was complaining of isolation and
3      boredom in March 2003 and had to be referred to the mental
4      health clinic clubhouse.

5    (AR 279 (citations to record omitted).)  After noting that "[t]here
6    has been no new expression of disability from any treating source, and
7    [that] the current treating source reports provide no indication of
8    any change in the nature or severity of [Plaintiff's] mental and
9    physical impairments," the ALJ stated that his "impression from the
10   earlier decision remains unchanged."  (AR 281.)

11        The trouble with this analysis is, again, that it ignores an
12   important aspect of the Appeals Council's mandate.  Once more, the
13   Appeals Council specifically instructed the ALJ to examine the
14   diagnosis of Dr. Beler and the residual functional capacity assessment
15   for internal consistency, and for "consisten[cy] with each other."
16   (AR 297.)  The ALJ did not perform this straightforward task.  This
17   omission matters because the Appeals Council also required the ALJ to
18   explain the weight he gave the treating source opinions.  (*See* AR
19   297.)  The ALJ did not do this, either.  (*See* AR 277-83.)  For these
20   additional reasons, the Court must reverse.

21   C.   Remand Is Appropriate

22        The determination whether to remand for further proceedings or
23   for payment of benefits lies within the discretion of the Court.
24   *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  In most
25   circumstances in Social Security disability cases, remand is
26   appropriate.  *See Moisa v. Barnhart*, 367 F.3d 882, 886-87 (9th Cir.
27   2004).  Remand may be productive where additional proceedings can
28   remedy defects in the original administrative proceedings.  *See*

                                    20

1   *Celaya v. Halter*, 332 F.3d 1177, 1184 (9th Cir. 2003)(ordering "remand

2   to the ALJ for a proper step-four analysis").

3        In this case, as explained above, the ALJ simply disregarded his

4   specific marching-orders from the Appeals Council.  This error

5   permeated the entire decision, and not just those specific portions

6   that Plaintiff has pointed out.  For example, the Appeals Council's

7   Order vacated the prior decision, (*see* AR 296), and explicitly

8   instructed the ALJ to "issue a new decision."  (AR 298.)  Instead of

9   issuing a new, stand-alone decision, however, the ALJ stated: "The

10  prior decision is incorporated by reference herein and remains the

11  decision on remand as supplemented herein below."  (AR 279.)  Aside

12  from the fact that this violated the express terms of the Appeals

13  Council's remand Order, it was a drafting method calculated to produce

14  an under-reasoned second decision.  *See Barrientos v. Barnhart*, No. 00

15  C 7404, 2003 WL 22844253, at *10, *13 (N.D.Ill. Nov. 26, 2003)(finding

16  that the "minimal analysis" of the ALJ's decision on remand "failed to

17  carry his burden of building a logical and accurate bridge between the

18  evidence presented and his decision denying benefits," in part because

19  the ALJ attempted to "incorporat[e] the prior vacated decision into

20  the new decision").  In Plaintiff's case, recycling the earlier

21  decision was an especially bad idea for another reason: the Appeals

22  Council had required the ALJ to redo the analysis from step one of the

23  sequential process.  (*See* AR 297.)

24        Remand is, therefore, necessary to enable another ALJ to perform

25  the specific tasks that the Appeals Council mandated in its December

26

27

28

21

26, 2002 Order and then produce a new decision.[7]  In particular, the ALJ *must* obtain medical source statements from Plaintiff's treating physicians, *must* evaluate the opinions of those treating physicians for internal consistency, consistency with one another, and consistency with the other evidence of record, and *must* explain the weight given to those opinions in a third decision.  An additional hearing and vocational or other expert testimony may be necessary, particularly if Plaintiff's treating physicians comply with the ALJ's request for medical source statements for the period spanning November 1, 1997 through December 31, 2002.

Finally, Plaintiff has requested that the Court award attorney's fees pursuant to 28 U.S.C. § 2412(d), the Equal Access to Justice Act. Plaintiff has not, however, set forth how much the attorney's fees are in this case.  The Court will reserve ruling on this issue.  The parties are directed to attempt to reach an agreement on the attorney's fees amount.  If they cannot agree, Plaintiff should submit a motion for fees and Defendant may oppose it.

---

[7]  The HALLEX regulations that define the Agency's internal procedures provide that Appeals Council remands will be assigned to the same ALJ who issued the decision or dismissal unless either "the case was previously assigned to that ALJ on a prior remand from the Appeals Council and the ALJ's decision or dismissal after remand is the subject of the new Appeal Council remand," or "the Appeals Council or the court directs that the case be assigned to a different ALJ." *See* HALLEX § I-2-155 D.11.  Under HALLEX, this matter should automatically be assigned to a different ALJ.  But because the Ninth Circuit has held that "HALLEX is a purely internal manual and as such has no legal force and is not binding," *see Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000), the Court specifically advises reassignment to a different ALJ, rather than relying on the Agency's voluntary adherence to HALLEX.

V.

CONCLUSION

For all the foregoing reasons, the Agency's decision is reversed and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.


DATED:    July  27 , 2005.


                              _____/s/_____
                              PATRICK J. WALSH
                              UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\FORSYTHE, P 373\Memo Opinion_Ord.wpd